Minute Order Form (06/97)

# United States District Court, Northern District of Illinois



| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7363 | **DATE** | 8/3/2001 |
| **CASE TITLE** | Johnny's Icehouse, Inc. et al. Vs. Amateur Hockey Assoc. of Ill. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiffs' motion for award of attorney's fees and other expenses granted as to liability. Amount of award deferred pending further submissions by parties pursuant to LR 54.3(d).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 0 7 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail A 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 AUG -6 PM 5: 07 | date mailed notice | |
| WAH | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHNNY'S ICEHOUSE, INC., et al., )
)
           Plaintiffs, )
)
v. ) No. 00 C 7363
)
AMATEUR HOCKEY ASSOCIATION OF )
ILLINOIS, et al., )
)
           Defendants. )

DOCKETED
AUG 0 7 2001

## MEMORANDUM OPINION AND ORDER

Johnny's IceHouse, Inc. and its fellow plaintiffs (collectively "Johnny's IceHouse," treated after this sentence as a singular noun) have moved under Fed. R. Civ. P. ("Rule") 54(d) for an award of attorney's fees and other expenses in the aggregate amount of $133,592.56 against Amateur Hockey Association of Illinois, Inc. and its individual codefendants (collectively "AHAI," also treated as a singular noun).[1] That award is sought on the strength of this Court's May 4, 2001 order ("Order") that memorialized AHAI's agreement to dismiss the two previously pending disciplinary actions against individual plaintiffs: in one instance Rachael Westenberg and her parents, and in the other instance Nikki Watts. AHAI's agreement and the

---

[1] For purposes of this opinion, Johnny's IceHouse's earlier Memorandum in Support of Plaintiffs' Emergency Motion for a Temporary Restraining Order is cited "J. TRO Mem.--." As for the briefs filed on the current motion, Johnny's IceHouse's opening memorandum is cited "J. Mem.--" and its supplemental memorandum is cited "J. Supp. Mem.--," with AHAI's intervening memorandum cited "A. Mem.--." This opinion employs the same "J." and "A." designations in referring to the parties' exhibits.

Order had in turn followed from this Court's April 3 ruling granting Johnny's IceHouse a temporary restraining order ("TRO") on those issues. With the motion now having been fully briefed, it is ripe for decision.

## Background

Johnny's IceHouse filed an Emergency Motion for a Temporary Restraining Order on February 13, 2001, based on a number of AHAI's actions that had allegedly been taken in retaliation for the filing of this lawsuit. Johnny's IceHouse primarily sought to restrain AHAI from pursuing (1) a disciplinary action against Rachael Westenberg based on an alleged debt owed to the Chicago Young Americans ("CYA") girls' hockey team (J. TRO Mem. 4-8) and (2) a disciplinary investigation against Nikki Watts for an alleged roster violation in playing for both Johnny's Chicago Chill's 15-and-under team and its 19-and-under team during an exhibition tournament in Minnesota (id. 8-9). Johnny's IceHouse also contended that AHAI was further retaliating by pressuring Chicago Chill President Bryan Barrish to withdraw Johnny's IceHouse's permission to use the Chicago Chill name (id. 9-10).

After two full days of evidentiary hearings on Johnny's IceHouse's motion, supplemented by extensive pre- and post-hearing briefing, on April 3 this Court found that Johnny's IceHouse had not met its burden on the Chicago Chill name issue but that it had more than amply sustained its burden, and was

2

therefore entitled to a TRO, regarding the Westenberg and Watts issues (Apr. 3 Tr. 6). As to those two issues this Court said in part (id. 8):

> It is nothing short, I again regret to say, nothing short of disgraceful for an organization such as AHAI, which has the responsibility imposed on it and undertaken by it to regulate this activity, to have its persons who are in authority so amorphous and so totally inconsistent as to what the operative rights and responsibilities and rules and procedures are. As I was listening to and examining the evidence as it was introduced, I must say the strong sense that I gleaned was that each of those who were either making or implementing policy for AHAI in the respects at issue here were sort of making it up as they went along. The plaintiffs' March 27th post-hearing memorandum demonstrated that, I thought, with a kind of devastating force. And the total impact is that the purported explanations were just rife with inconsistencies. And there is no predicate for subjecting people who are seeking to participate in the activity to that kind of really anarchic structure, or more accurately lack of structure.
>
> Accordingly my sense is that the TRO certainly should be granted with respect to those two items.

In light of that ruling, on April 26 AHAI agreed to discontinue both the Westenberg disciplinary proceeding and the Watts disciplinary investigation permanently. This Court's Order memorialized that agreement, stating in relevant part:

> The AHAI defendants will not at any time in the future pursue, either directly or indirectly, any disciplinary proceedings, investigations, or action of any kind against any person or entity regarding the Westenbergs' alleged debt to CYA.
>
> In addition, in light of the Court's April 3, 2001 ruling, the AHAI defendants will not pursue, either directly or indirectly, any investigation, hearing, or discipline against any person relating to an alleged roster violation, or to the events leading up to the alleged roster violation, involving Coach Richard Marshall and plaintiff Nikki Watts

3

that occurred in Minnesota in November 2000.

Based on its success on the Westenberg and Watts issues, Johnny's IceHouse now moves for an award of attorney's fees--an interim award in terms of this litigation as a whole, but a final award as to the subject matter of the Order.

## Prevailing Party?

This opinion must first address a cutting edge issue by reason of the United States Supreme Court's recent decision in Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources, 121 S.Ct. 1835 (2001). Because Buckhannon has newly announced that the "catalyst theory" is not a permissible basis for an award of attorney's fees, the initial question is whether Johnny's IceHouse qualifies as a "prevailing party" under Rule 54(d).

Before Buckhannon all but one of the Courts of Appeals that had addressed the issue (including ours) had recognized the catalyst theory, under which a plaintiff could be held a prevailing party and hence entitled to attorney's fees if it achieved its desired result because the lawsuit brought about a voluntary change in a defendant's conduct (Buckhannon, 121 S.Ct. at 1838 & n.3). But Buckhannon, 121 S.Ct. at 1840 found the catalyst theory to be inconsistent with Supreme Court teaching that a plaintiff prevails only when there is a "material alteration of the legal relationship of the parties" (quoting

Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93 (1989)). Where a defendant voluntarily changes its conduct, the change "lacks the necessary judicial *imprimatur*" for a finding that the plaintiff has prevailed (121 S.Ct. at 1840).

So Johnny's IceHouse could not be deemed the prevailing party if its TRO action had simply brought about AHAI's voluntary dismissal of the proceedings against the Westenbergs and Watts. In that respect, once this Court had called counsel's attention to Buckhannon and had asked the parties to address the impact (if any) of that decision on the then-pending motion, Johnny's IceHouse's Supplemental Memorandum argued that it is still a prevailing party in terms of Buckhannon's approach because of this Court's findings of fact made in its favor at the TRO hearing and because the prohibitions against AHAI's future activity have been embodied in the Order, which (like all such orders) has thus become subject to judicial enforcement and oversight (J. Supp. Mem. 4).

In response AHAI has argued that Johnny's IceHouse is not a prevailing party because Buckhannon, 121 S.Ct. at 1840 limited that phrase to parties that achieve either (1) an enforceable judgment on the merits or (2) a court-ordered consent decree (A. Mem. 3-4). As AHAI would have it, the Order was neither of those.

Buckhannon cannot be fairly read so narrowly--or perhaps to

put the matter differently, the concept of a court-ordered consent decree must be read more broadly than AHAI would admit, so as to embrace the Order. Buckhannon, 121 S.Ct. at 1841 pointed to enforceable judgments on the merits and court-ordered consent decrees as examples of material alterations of parties' legal relationships, but the Court did not hold that those are the only instances in which a party may be deemed to have prevailed. Indeed, the four-Justice dissent, id. at 1850 characterized the holding as insisting "that there be a document filed in court," summarizing the majority opinion in these terms (id. at 1849):

> The Court today holds that a plaintiff whose suit prompts the precise relief she seeks does not "prevail," and hence cannot obtain an award of attorney's fees, unless she also secures a court entry memorializing her victory. The entry need not be a judgment on the merits. Nor need there be any finding of wrongdoing. A court-approved settlement will do.[2]

Johnny's IceHouse is wholly persuasive in urging that the Order formalizing and memorializing AHAI's commitment legally altered the relationship between the parties, making Johnny's IceHouse a prevailing party under the standard announced in Buckhannon. That Order subjected what would otherwise have been

---

[2] [Footnote by this Court] This Court is of course well aware that it can be perilous to rely too heavily on a dissenting opinion's characterization of the majority's holding (sometimes advanced as a kind of rear-guard action, in an effort to limit the scope of a holding opposed by the dissenters). In this instance, though, the quoted language is a fair statement of the majority opinion as it impacts on this case.

merely a private agreement to judicial oversight and enforcement (see 121 S.Ct. at 1840 n. 7)--and it did so in response to Johnny's IceHouse's concerns that a purely voluntary undertaking on AHAI's part would not alone provide adequate protection for the future.

Moreover, the Order clearly bears the mark of judicial sanction. AHAI's agreement to drop the disciplinary proceedings against the Westenbergs and Watts arose out of this Court's finding of wrongdoing on AHAI's part after a full-fledged factual hearing.[3] And AHAI agreed to reduce its commitment to a court order both in response to Johnny's IceHouse's legitimate concerns and at this Court's request, a procedure that obviated a conversion of the TRO into a preliminary injunction (April 26 Tr. 11). Those circumstances surrounding the entry of the Order strongly bolster the view that Johnny's IceHouse is plainly a prevailing party under Buckhannon.

AHAI also strikes out on its other attempt to label Johnny's

---

[3] AHAI argues that the Westenberg issue was dropped not because of this Court's April 3 findings but rather because CYA dismissed its administrative complaint against the Westenbergs, thereby divesting AHAI of jurisdiction over the issue. But that is no more than a red herring: There can be no doubt that CYA itself engaged in that dismissal in light of this Court's findings, which had made plain that there was no basis under AHAI's rules or regulations for CYA's attempted action. In that respect the relationships between CYA and AHAI must also be kept in mind: CYA President Stephen Morrow is also an AHAI official, as is his wife and CYA girls' teams manager Kathy Morrow, who testified at the TRO hearing regarding the Westenberg issue.

7

IceHouse as other than a prevailing party. In that regard AHAI argues that because this Court made no findings on the merits of Johnny's IceHouse's Title IX claim, Johnny's IceHouse is not a prevailing party under the holdings of such cases as <u>Libby v. Illinois High Sch. Ass'n</u>, 921 F.2d 96 (7th Cir. 1990). That contention ignores the fact, often reiterated in the Title VII context but equally applicable to Title IX actions, that a claim for retaliation is a discrete claim upon which a plaintiff may recover even if he or she does not ultimately prevail on the merits of the substantive discrimination claim (see, e.g., <u>Sweeney v. West</u>, 149 F.3d 550, 554 (7th Cir. 1998)). Unlike the situation in <u>Libby</u>, no further proceedings in this case have the potential to defeat Johnny's IceHouse's already-achieved success on the two aspects of its retaliation claim. Accordingly it is entitled to attorney's fees for its efforts in that regard.

<u>Reasonableness of Fees</u>

In dealing with fee-shifting situations (the imposition on one litigant of the costs of legal representation furnished to the litigant's opponent), the free market--the agreement reached between lawyer and client--may or may not dictate the amount of the "reasonable fee" that the cases require a court to determine. For example, where as here a plaintiff's counsel has undertaken

representation on a contingent fee basis,[4] or where for example counsel are acting entirely pro bono publico or on a basis discounted from normal billing rates for one reason or another, a court's determination of reasonableness must follow a different course. That normally begins by determining the number of hours reasonably expended, multiplied by a reasonable hourly rate, after which the court will look to other considerations (including the results obtained) that may lead to an upward or downward adjustment of the fee (Hensley v. Eckerhart, 461 U.S. 424, 433-37 (1983); People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1310 (7th Cir. 1996)).

AHAI advances several reasons why it believes that Johnny's IceHouse's requested fees and expenses (if allowed at all) should be reduced as unreasonable: that the requested hourly rates exceed market rates; that certain billing entries are "block billed," duplicative, excessive or unsubstantiated; and that the requested fees are excessive in relation to the extent of Johnny's IceHouse's success. This opinion addresses those objections in turn.

Market Rates

In part for the reasons stated earlier, People Who Care, 90 F.3d at 1310 (internal citations and quotation marks omitted)

---

[4] Counsel for Johnny's IceHouse has agreed that in the absence of any judicial award of fees against its adversaries, no charge will be made for their extensive legal services.

sets forth the standard inquiry for determining "reasonable hourly rates":

> In determining "reasonable hourly rates," the Supreme Court has repeatedly stressed that attorney's fees awarded under Section 1988 are to be based on market rates for services rendered. The attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate. If the court is unable to determine the attorney's true billing rate, however (because he maintains a contingent fee or public interest practice, for example), then the court should look to the next best evidence--the rate charged by lawyers in the community of reasonably comparable skill, experience and reputation.

Johnny's IceHouse bears the burden of proving the market rate (id. at 1311). Once it has done so, the burden shifts to AHAI to demonstrate why a lower rate should be awarded (id. at 1313; see also such cases as Batt v. Micro Warehouse, Inc., 241 F.3d 891, 894 (7th Cir. 2001) and Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 554-55 (7th Cir. 1999)).

Johnny's IceHouse submits that it is entitled to recover hourly rates of $495 for lead attorney Alan Salpeter ("Salpeter"), $295 for associate Adrienne Hiegel ("Hiegel"), $185 for associate Jason Fliegel ("Fliegel"), $155 for two paralegals, $130 for litigation support and $40 for support services. In support of these rates Salpeter submitted an affidavit attesting that those are the hourly rates normally charged by Mayer, Brown & Platt for each attorney's services, although (as stated earlier) the firm has agreed to represent Johnny's IceHouse in this action on a pro bono basis unless fee-shifting is available

10

(Salpeter Aff. ¶2,5).

Because Johnny's IceHouse's attorneys charge virtually all of their paying clients at the same rates and because clients who may receive a modest 5% discount because of the volume of work they provide constitute a very small percentage of counsel's overall work (Salpeter R. Aff. ¶7), that evidence unquestionably suffices to establish their market rates: It represents the amount the attorneys would have received if they had not been representing Johnny's IceHouse, but rather working for paying clients (People Who Care, 90 F.3d at 1313)--in economic terms, their opportunity cost in taking this action. Hence those rates are considered presumptively appropriate, and the burden shifts to AHAI to present evidence establishing "a good reason why a lower rate is essential" (People Who Care, 90 F.3d at 1313, quoting Gusman v. Unisys Corp., 986 F.2d 1146, 1151 (7th Cir. 1993)).

On that score AHAI argues that the hourly rates requested for the work done by Salpeter and Hiegel far exceed market rates set in other civil rights cases, and AHAI further suggests that they exceed market rates for comparable Chicago attorneys. To that end AHAI points to other civil rights cases in which lead counsel had been allowed hourly rates ranging from $300-$325 per hour and a second-chair attorney was allowed an hourly rate of $175 per hour (see, e.g., Krislov v. Rednour, 97 F.Supp.2d 862,

11

870 (N.D. Ill. 2000)). AHAI also submits the affidavit of its lead counsel Ronald Safer ("Safer") attesting that Schiff, Hardin & Waite's standard hourly billing rates for lead counsel on this matter are $350 for Max Brittain, Jr., $325 for Ralph Morris and $350 for Safer (Safer Aff. ¶3). Associate Jennifer Cerven's standard hourly billing rate is $230 (id.). Finally, AHAI points out that while Salpeter is an experienced litigator, he does not have extensive case experience arising out of civil rights litigation under Title IX or otherwise (A. Ex. C).

There is however an inherent logical fallacy in the approach urged by AHAI, which would pigeonhole this action in generic terms as a "civil rights action" and then proceed to draw invidious comparisons between the Mayer Brown lawyers' hourly rates and the rates charged by lawyers who handle more conventional litigation that comes under the civil rights rubric and who charge less for their time. This is not at all a situation comparable to that in Cooper v. Casey, 97 F.3d 914, 920-21 (7th Cir.), where prisoners' rights litigation under Section 1983 was in a well-marked-out area of law such that comparisons of that type could have legitimate force. Nor is this case at all akin to that in Beard v. Teska, 31 F.3d 942 (10th Cir. 1994), where this Court wrote for a Tenth Circuit panel addressing a claim for fees in a specialized area of school law with an established market for the rates regularly charged by

12

qualified practitioners, while the applicant lawyer submitted his own market rate established in wholly unrelated areas of the legal practice. Instead this litigation poses not only civil rights issues of an unusual nature but also antitrust claims, the retaliation claims at issue, breach of fiduciary duty claims and breach of contract claims[5]--all requiring a far greater overall breadth of skills (and a high quality of litigation skills generally), all of whose demands were well met by Johnny's IceHouse's counsel.

Nor would it do, for example, to try to split out the issues posed by the portion of this case that has generated the present claim for fees, coupling that proposed severance with an argument that less expensive counsel might have done the job for less. To begin with, the retaliation claims on which Johnny's IceHouse prevailed and that are now at issue were integral to and inextricably linked with the other claims. And it would be entirely unrealistic (and indeed uneconomic, something about which AHAI could legitimately complain if it had been done) to require Johnny's IceHouse's counsel to have compartmentalized their handling of the litigation in that fashion.[6]

---

[5] Here the question is not whether all of those claims are ultimately sustainable, but rather the level of skills and experience required to conceptualize, develop and pursue the claims in court and out.

[6] That the Schiff Hardin & Waite attorneys normally charge lower hourly rates than Salpeter and Hiegel also does not show

13

Hours Spent and Expenses Incurred

This District Court has established a carefully structured procedure in its LR 54.3 that serves to implement Rule 54(d) in addressing fee awards stemming from the entry of judgment. But LR 54.3(d) also plays a constructive role in situations such as the present one, for parties who follow its provisions are able to narrow the focus of any disputed aspects of the fee request both for themselves and for the court. At this time the litigants are engaged in the LR 54.3(d) process, and this Court's ruling as to the reasonableness of the lawyers' hours and the out-of-pocket expenses claimed by Johnny's IceHouse will of course be deferred until this Court is provided the necessary grist for the judicial mill in those respects.

Results Obtained

AHAI argues finally that the lodestar figure should be reduced because Johnny's IceHouse's success was limited. As cases such as Farrar v. Hobby, 506 U.S. 103, 114 (1992)(quoting Hensley, 461 U.S. at 436) teach:

---

that a lower rate is "essential" (the term employed in Gusman and People Who Care). For example, Salpeter adduces important distinguishing factors that militate against such one-to-one comparisons. And most significantly, it is market forces rather than a judge's subjective impressions that best valuate the hourly rate that an attorney merits based on his or her experience, skills and efficiency. Thus it is not for this Court to second-guess that valuation (except, of course, in cases such as Cooper and Beard, where an attorney is practicing outside of his or her area of expertise).

14

Indeed, "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained."

Connolly v. National Sch. Bus Serv., Inc., 177 F.3d 593, 597 (7th Cir. 1999)(internal citations and quotation marks omitted) sets out a three-part test for evaluating "degree of success":

> Under this test, we look at the difference between the judgment recovered and the recovery sought, the significance of the legal issues on which the plaintiff prevailed and, finally, the public purpose served by the litigation. The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case.

AHAI argues that Johnny's IceHouse's success was limited because it did not obtain a broad injunction against retaliation and it did not succeed on the "Chill" name issue (A. Mem. 6). AHAI further points out that the Order barring AHAI from pursuing the Westenberg and Watts issues affected only the Westenbergs and Watts, assertedly providing no benefit to the rest of the plaintiffs (id.).

That latter contention does not call for a limited-success reduction. There is certainly nothing inappropriate about the pursuit of claims that relate to some but not all of a lawyer's litigation clients. In any event, the Johnny's IceHouse motion for a TRO explained that the pursuit of those disciplinary proceedings could result in the suspension of the Chicago Chill teams (J. TRO Mem. 12), and there was no evidence submitted at

15

the hearing to rebut that assertion.[7]

As for Johnny's IceHouse's lack of success on the "Chill" name issue, the Hensley approach to the concepts of "results obtained" and "limited success" (461 U.S. at 434-37), which has not been vitiated by Farrar (506 U.S. at 114), raises a serious question as to whether that may call for some reduction in its attorney fee award. In substantial part that possibility really depends on whether it is feasible (or indeed appropriate) to attempt to carve that time out of the time for which counsel now make their claim (issues on which the parties have not provided all the necessary input, but which they are expected to deal with in the LR 54.3 submissions referred to in the preceding section).

But in all events, any such reduction (if it were to be made at all) would have to be small, for the "Chill" name issue was certainly secondary in terms of both the importance that Johnny's IceHouse placed on it and the limited time that was devoted to it at the hearing. What is most significant is that Johnny's

---

[7] Moreover, the TRO proceeding resulted in this Court's denunciation of AHAI's running what this Court characterized as TEGWAR ("The Exciting Game Without Any Rules") as far as girls' hockey is concerned. Later developments in the litigation have suggested that this Court's ruling has had a substantial deterrent impact on AHAI's arbitrary policymaking, as well as fostering AHAI's proposed implementation of rules and regulations for girls' hockey, changes that will benefit all of the plaintiffs and others not involved in this action. It is surely fair to say that Johnny's IceHouse's submissions "evince a public purpose rather than merely attempt to redress a private injury" (Maul v. Constan, 23 F.3d 143, 146 (7th Cir. 1994)), further supporting its claim for attorneys' fees.

16

IceHouse obtained through the Order the ultimate equitable relief that it sought on the two issues that were literally front and center in its Memorandum in support of its TRO motion (J. TRO Mem. 2)(see Hensley, 461 U.S. at 436-37).

## Conclusion

Johnny's IceHouse prevails in the substantive respects dealt with in this opinion. Quantification of its just-established entitlement to fees and expenses, however, will await the submission of the LR 54.3(d) information and materials for resolution by this Court.

                                              _____
                                              Milton I. Shadur
                                              Senior United States District Judge

Date: August 2, 2001